UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
JENET CHRISTIAN and NEIDHRA
MAHENDRAN,                                          **DECISION**
                                                   Case No. 17-CV-04721 (FB) (RLM)
                        Plaintiffs,

        -against-

METROPOLITAN SPECIALTY LAB'S,
INC.; VADIM TEVELEV, *individually*; and
LEO ABRAMOVSKY, *individually*,

                        Defendants.
-----------------------------------------------------x

Appearances:
*For the Plaintiffs*:                    *For the Defendants*:
ALEX UMANSKY                             STEPHEN VINCTENT BARBARO
Law Office of Yuriy Moshes, PC           Alter and Barbaro
517 Brighton Beach Avenue, Floor 2       26 Court Street
Brooklyn, NY 11235                       Brooklyn, NY 11242

**BLOCK, Senior District Judge:**

Jenet Christian and Neidhra Mahendran have sued their former employer,

Metropolitan Specialty Lab's ("MSL"),[1] and two of its principals, Vadim Tevelev

and Leo Abramovsky.  The plaintiffs assert underpayment of wages in violation of

the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"),

as well as failure to provide written notices as required by the Wage Theft Prevention

---

[1] The case caption and MSL's formal registration documents and stamp
include the apostrophe in the company's name.  Most internal documents, however,
omit the apostrophe.  *See, e.g.*, Pl. Exs. 6, 14–17, 24–26, 28–30.

1

Act ("WTPA").  Christian also asserts a retaliation claim under the NYLL.

The Court held a bench trial on May 6, May 7, May 14, and June 4, 2019.[2] The parties submitted trial briefs on July 10 and July 11, 2019.  Pursuant to Federal Rule of Civil Procedure 52(a), this Decision constitutes the Court's final findings of fact and conclusions of law, including an in-depth presentation of the evidence adduced at trial.  As explained below, although the plaintiffs demand $459,377.68, the Court awards $239,430.98, along with prejudgment interest.

## I.  UNCONTESTED FACTS AND GENERAL OVERVIEW

### A.  General Timeline

The parties agree on the following factual background and general timeline.

At all relevant times, Tevelev and Abramovsky have jointly owned and operated MSL, a biological testing laboratory.  MSL's primary business is to perform diagnostic tests on bodily fluid samples sent in by outside healthcare providers.

Christian began working for MSL in February 2012 as a receptionist earning $15.00 per hour.  Eventually, she received a raise, earning a biweekly salary of $1,950.00.  Mahendran began working for MSL in December 2010 or January 2011 as a laboratory technologist earning $26.00 per hour.

---

[2] Although the complaint included a jury demand, *see* Dkt. No. 1-1, all parties formally waived their right to a jury at the start of the trial, *see* Dkt. 5/6/2019.

In 2012, the lab experienced two problems in rapid succession.  First, in July, the lab's director quit.  Under state law, a lab like MSL cannot operate without a director.  The New York State Department of Health ("DOH") revoked MSL's permit to operate by written letter on July 17, 2012.  Second, Hurricane Sandy hit New York on October 29, 2012.  The lab is located on Staten Island, and much of its equipment and testing materials were severely damaged or destroyed.  The upshot was that the lab was both legally and practically unable to operate and generate revenue.

With the company in dire straits, Tevelev and Abramovsky convened a staff meeting shortly after the hurricane.  Most employees, including Mahendran, were laid off at the meeting.  Several people, however, including Christian, were asked to stay and help restore the lab.

As a condition of regaining its permit, the lab had to demonstrate that it had the technical capability to perform tests.  To determine whether a lab has such capabilities, the DOH sends so-called "proficiency tests" to candidate labs.  The parties dispute how much work goes into testing these "proficiencies," but agree that DOH only sent MSL a handful of samples.

To regain its permit, the lab also hired a new director, Dr. Maqsood Sheikh, in December 2012.  In addition, the lab's general supervisor resigned in July 2013.  State law requires labs like MSL to employ a general supervisor in addition to a

director, and Mahendran was asked to return to fill that role soon after the previous supervisor's resignation. On July 18, 2013, Mahendran was named the new general supervisor.

The DOH restored the lab's permit on July 22, 2013. The lab began receiving payments from Medicare—a substantial if not predominant source of revenue—in early 2014,[3] and Christian and Mahendran were restored to payroll status by April 2014.[4]

Christian continued working at the lab until January 25, 2017; the parties dispute the reason for her departure. Mahendran continued working at the lab until mid-October 2015 when she voluntarily resigned because she was pregnant and did not wish to work at MSL anymore.

## B.  **Witnesses at Trial**

In addition to the plaintiffs and the individual defendants, three witnesses testified at trial. The first was Dr. Sheikh, who testified for the defendants on May

---

[3] The parties are somewhat divided on this point. Christian testified that one of her duties in 2013 was contacting patients to settle account. *See* Tr. 5/6/2019 at 89:6–8. She did not mention Medicare at all in her testimony. Tevelev, however, explained that the lab only received money from insurance providers like Medicare and never from patients directly, *see* Tr. 5//14/2019 at 53:12–17, and that the lab only started receiving Medicare payments in early 2014 when the lab "reopened," Tr. 5/7/2019 at 225:24–25; Tr. 5/14/2019 at 49:13–19.

[4] Although the plaintiffs agree that payroll restarted in April, they both claim that they were underpaid even once they were on payroll status. Moreover, evidence introduced at trial, some of it discussed below, suggests that payroll may have resumed before April.

7, 2019. The second was Rosti Slonimskiy, an IT professional who serviced the lab around 2012 and 2013; Slonismkiy also testified for the defendants on May 7, 2019. Finally, Gurupasath Sundaresan ("Guru") Durairajan testified for the plaintiffs on May 14, 2019. Guru was a fellow MSL employee and was also asked to stay along with Christian to restore the lab.

## C.    <u>Svetlana Nemirovsky</u>

Many exhibits introduced into evidence by the plaintiffs, as well as extensive testimony from both parties, referenced an individual named Svetlana Nemirovsky.[5] Both sides repeatedly referred to Svetlana, but they were at odds as to what role, if any, she had at MSL. Although her identity and role does not significantly affect the Court's factual findings, her repeated appearances in the record merit a brief discussion.

The defendants' uncontroverted testimony is that Svetlana was married to Abramovsky's close friend and at one point had been interested in becoming an

---

[5] "Nemirovsky" is the most common spelling used in the exhibits and is how Christian spelled the name to the court reporter. Tr. 5/6/2019 at 21:15. However, the exhibits also refer to a "Svetlana Nemirovskaya," Pl. Ex. 6, and a "Svetlana Nemerovskaya," Pl. Ex. 31. In addition, Abramovsky referred to a "Sveta" in his testimony. See Tr. 6/4/2019 at 22:22–23. The Court assumes that the inconsistency in the "i" and "e" spellings is caused either by alternative transliterations or scrivener's error. The Court also takes judicial notice of the Russian language's usage of grammatically gendered surnames and that "Sveta" is a common diminutive form of "Svetlana." The Court thus finds that these names all refer to the same person. With no intended disrespect, this Decision refers to the individual as "Svetlana" because that is how the witnesses referred to her throughout the trial.

investor in MSL. *See* Tr. 5/7/2019 at 242:5–13.[6] Although the defendants insisted that she had no formal role at MSL, they did testify that she helped them on an informal basis. For example, Abramovsky testified that she translated for him between English and Russian when he wished to speak to employees, vendors, and the DOH. On occasion, she would also physically furnish payments to employees. *See, e.g.*, Tr. 6/4/2019 at 22:5–11.

Certain exhibits introduced by the plaintiffs purport to bear Svetlana's signature. *See, e.g.*, Pl. Exs. 6, 10, 23. Abramovsky testified that he was not familiar with her signature. Tr. 6/4/2019 at 13:6–7. Tevelev, on the other hand, testified inconsistently when asked about her signature. *Compare* Tr. 5/7/2019 at 265:24–266:4 (identifying Svetlana's signature), *with* Tr. 5/14/2019 at 36:12–13 ("I have no idea. I never saw her signature before.").

The plaintiffs' position on Svetlana is somewhat different. Both plaintiffs, as well as Guru, characterized her as a full-time employee of MSL who worked in a managerial capacity. One document introduced by the plaintiffs lists her position as "Vice-President," Pl. Ex. 6, another implies that she had her own credentials to access MSL computer system, *see* Pl. Ex. 32, and a third contains an email chain in which she appears to have emailed the DOH on MSL's behalf, *see* Pl. Ex. 31.

---

[6] Abramovsky testified that he had not seen Svetlana since the death of their mutual friend six years ago. Tr. 6/4/2019 at 13:8–9.

Although Svetlana was originally listed on the defendants' witness list in their proposed pretrial order, *see* Dkt. No. 28 at 6, the defendants did not call her to testify. Noting that significant portions of the plaintiffs' evidence reference Svetlana, the Court suggested that they may themselves wish to call her as a witness and warned that if there are any evidentiary gaps that could have been filed by her testimony, the Court may draw an adverse inference if she does not testify. *See United States v. Caccia*, 122 F.3d 136, 139 (2d Cir. 1997) (adverse inference may be drawn against a party failing to call a witness that was equally available to both sides when the facts warrant it). Although Svetlana was ultimately subpoenaed by the plaintiffs, she did not appear as directed. Both parties declined the Court's offer to secure her appearance via arrest by the United States Marshals Services, explicitly confirming that they do not wish to call her as a witness. *See* Tr. 6/4/2019 at 4:14–6:8.

## D.     Christian's Spreadsheet

Concerned about MSL's ability to continue paying her once it lost its permit in 2012, *see* Tr. 5/6/2019 at 26:8–11, Christian created a spreadsheet to document her earnings, *see* Pl. Ex. 3. Each row of the spreadsheet corresponds to a pay period and lists her salary for that pay period, how much she was paid (in either cash or check), and what balance remained unpaid. Christian testified that she updated the spreadsheet contemporaneously with each pay period. Tr. 5/6/2019 at 27:3–5, 27:21–23. Mahendran maintained no similar contemporaneous record of her

earnings.

## E.     Paystubs and Three-Heading Tables

In addition to her spreadsheet, Christian introduced a document containing two parts, both of which pertain to her earnings during the 09.24.12–10.07.12 pay period.  *See* Pl. Ex. 4.[7]  The first part of the document shows Christian's name and the pay period, as well as a table with three headings: "WE OWE," "WE PAID," and "BAL. OWED TO EMP."  Underneath these headings are corresponding dollar amounts, indicating that Christian was owed $1,597.16, was paid $800.00, and was thus owed a balance of $797.16.  The second part of the document appears to be a paystub with a perforation where a preprinted check might have been previously attached.  The paystub shows MSL's stamp, Christian's name, the same pay period, gross earnings ($1,950.00), various enumerated deductions, and a different net amount owed ($1,498.58).

Mahendran introduced a similar exhibit pertaining to the same pay period. *See* Pl. Ex. 20.  Unlike Christian's exhibit, however, hers contains three parts.[8]  The

---

[7] The plaintiffs' attorney represented that these two "parts" were actually two separate strips of paper that were photocopied onto a single sheet.  *See* Tr. 5/6/2019 at 29:7–8.  Both the single sheet containing the photocopies and the two separate original strips were introduced into evidence (as Plaintiffs' Exhibit 4).

[8] These three "parts" similarly appear to be three separate strips of paper that were photocopied onto a single sheet.  Unlike Christian's exhibit, however, only the single sheet containing the photocopies was introduced into evidence (as Plaintiffs' Exhibit 20).  *See* Tr. 5/7/2019 at 127:15–128:15.

second two parts are similar to Christian's exhibit, with one part corresponding to the table with the three headings, and one corresponding to the paystub. The remaining part also appears to be generated by payroll software, but shows still different numbers; this part was also not labeled with a pay period and showed Mahendran working for slightly different hours (80.1 instead of 84).

During the plaintiffs' testimonies, the Court inquired as to the exhibits' internal inconsistencies. For example, Christian's exhibit shows in one part that she was entitled to $1,498.58 (post-deduction) and in the other that she was entitled to $1,597.16 (presumably post-deduction, although the exhibit itself does not say). Mahendran's exhibit similarly shows in one part that she was entitled to $1,640.63 (post-deduction), in another that she was entitled to $1,709.51 (post-deduction), and in a third that she was entitled to $2,353.66 (again, presumably post-deduction). In addition, a particular dollar amount ($1,709.51) appears in two different places in Mahendran's exhibit with two different meanings. First, it appears as the post-deduction figure in the paystub—that is, the amount that would have presumably been on the attached, perforated check. Second, it appears in the three-heading table as the balance owed—that is, the amount that she was owed once a partial payment ($644.15) was taken into account.

The only explanation Christian and Mahendran gave for these exhibits was that their official paychecks bounced, after which Svetlana gave them partial

payments, and memorialized the amounts owed in the three-heading tables (which she prepared and furnished to the plaintiffs). Neither plaintiff gave an explanation for the inconsistencies between the tables and the paystubs. Because Svetlana was not called as a witness, she was unable to corroborate that she created the tables, nor explain their inconsistencies.[9]

**F.** **Letters**

The plaintiffs introduced several letters into evidence, two of which merit special attention.

The first letter is dated June 3, 2013, and is addressed "To whom it may concern." Pl. Ex. 6. It purports to be signed by "Svetlana Nemirovskaya, Vice-President." The letter states that "Ms. Jenet Christian is a full-time employee currently working as Accession personnel / Receptionist at our laboratory." The letter explains that it "is issued upon request of Ms. Jenet Christian for whatever purpose it may serve her best." Christian testified that Svetlana gave her the letter "to confirm that [Christian was] working through while the lab was not testing specimens and [was] closed." Tr. 5/6/2019 at 48:16–17.

The second letter is dated December 12, 2013 and is also addressed "To whom

---

[9] A silver lining is one of the figures in Christian's document. Under the "WE PAID" heading in the three-heading table, it recites that she was paid $800.00 for that pay period. That figure is consistent with her contemporaneously maintained spreadsheet.

it may concern." Pl. Ex. 24. It purports to be signed by "Vadim Tevelev, Owner." This letter states that "Ms. Neidhra Mahendran is an employee at Metropolitan Specialty Labs," listing her employment "from Jan 2011 to Dec 2012 as a Medical Technologist and from July 2013 onwards as a General Lab Supervisor." The letter then states that Mahendran's "gross salary is $3,000 for a pay period of Two weeks." Finally, and perhaps most importantly, the letter recites the history of the lab's troubles (including Hurricane Sandy and the loss of permit), and concludes by explaining that "[o]wing to the disruption of our services, the salaries of Neidhra Mahendran remained impaired since 2012. However, we are committed to pay all past salaries and along with her regular salary to the said employee once the lab resumes its full function." Mahendran testified that Tevelev gave her this letter when she asked for documentation that she was owed money. *See, e.g.*, Tr. 5/7/2019 at 143:9–21.

The defendants did not substantively challenge the contents of the first letter (although Tevelev denied having prior knowledge of its existence and disputed Svetlana's title, *see* Tr. 5/14 at 36:8–17). But they vigorously challenged the second letter's authenticity. In particular, Tevelev testified that he never issued the letter and never signed any letters as "Owner," making it a practice to always sign as "President" instead. In support, he pointed to another letter, *see* Pl. Ex. 28, which he testified was prepared for immigration purposes, and which bears his signature

and name followed by the title "President."  He also pointed out that the letterhead on the disputed letter differs slightly from the letterhead on all other letters in evidence.  *Compare* Pl. Ex. 24 (showing a letterhead with a telephone and fax numbers), *with* Pl. Ex. 6 (no telephone or fax numbers), Pl. Ex. 28 (same), *and* Pl. Ex. 30 (same).  Moreover, he noted that the letter implies that MSL lost its permit because of Hurricane Sandy, whereas it lost its permit several months earlier when the previous director quit.  Finally, Tevelev pointed out that he would never have promised a $3,000.00 biweekly salary to a lab supervisor, noting that that was how much Dr. Sheikh made.  *See* Tr. 5/14/2019 at 55:10–11 (explaining that it is "much easier to find lab supervisor than lab director").

## G.  <u>Defendants' Records</u>

The defendants testified that they originally maintained an electronic clock-in-clock-out system for employees, but that records generated by the system had been destroyed by Hurricane Sandy.  Tevelev testified that he is "not sure if [he has] a hundred percent accurate records from 2013 because it was [sic] mess in 2013."  Tr. 5/14/2019 at 39:23–25.  The first complete set of payroll records introduced by the defendants begin in April 2014.  *See* Pl. Exs. 15–17, 25–26.

The defendants also introduced several handwritten notes that appear to span the time period between October 8, 2012 and January 25, 2014.  *See* Def. Ex. A. They purport to show when certain employees (including Christian and Mahendran)

were scheduled to work and how much they were paid. These records, however, are far from complete and are somewhat cryptic: for example, the records only show a checkmark for Christian on June 4, 2013, while it shows specific hours for her and other employees on other dates. And a handwritten column marked "Paid" only appears on the first few sheets.

When these records were admitted into evidence, Tevelev testified that he could not remember who maintained them, noting that it was likely multiple people, Tr. At 5/14/2019 at 46:23–47:3, but that he was "definitely . . . involved," *id.* at 44:6.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    Underpayment Claims

The FLSA requires covered employers to "make, keep, and preserve" records, including "wages, hours, and other conditions and practices of employment." 29 U.S.C. § 211(c). The DOL has promulgated detailed rules describing what such records must contain, including, *inter alia*, "total wages paid each pay period" and "date of payment and the pay period covered by the payment." 29 C.F.R. § 516.2. "When a defendant in a suit for lost wages under the FLSA fails to maintain employment records as required by the Act, an employee . . . 'may submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred.'" *Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997) (quoting *Martin v. Selker Bros, Inc.*, 949 F.2d 1286, 1297 (3d Cir.

13

1991)). Such evidence "may include representative testimony." *Indergit v. Rite Aid Corp.*, 52 F. Supp. 3d 522, 525 (S.D.N.Y. 2014). The NYLL establishes a very similar burden-shifting framework. *See O'Donnell v. JEF Golf Corp.*, 173 A.D.3d 1528, 1529 (N.Y. App. Div. 2019).

The Court finds that the defendants have failed to maintain adequate employment records. The Court additionally finds that Christian's contemporaneously maintained spreadsheet is "sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." *Reich*, 121 F.3d at 66.[10] The Court further finds that Plaintiffs' Exhibits 4 and 20 (Christian's and Mahendran's paystubs and 3-heading tables) are not sufficiently reliable evidence because of their internal inconsistency and lack of corroboration.[11] Finally, the Court finds that Plaintiffs' Exhibit 24 (the letter purporting to be from Tevelev explaining that Mahendran was promised a $3000.00 biweekly salary that has been "impaired") is not sufficiently reliable evidence. In particular, the Court

---

[10] There is one unexplained inconsistency in Christian's spreadsheet: for the 10.22.12–11.4.12 pay period, she recorded that she was owed $1950.00, was paid nothing, but was only owed a balance of $975.00. The Court assumes that she forgot to enter a partial payment and finds that she is owed $975.00 for that pay period.

[11] If Svetlana testified, it is possible that she could have rehabilitated this evidence, especially by explaining the provenance of the three-heading table and the reason for its inconsistency with the pay stubs. Based on the plaintiffs' failure to call Svetalana to testify despite the Court's repeated invitations to secure her appearance, the Court infers that her testimony would have been harmful to their case.

credits the defendants' arguments that the promised biweekly salary of $3,000.00 is too high to be credible. The Court's conclusion is also bolstered by the defendants' other arguments about the letter's authenticity, including the aberrant letterhead and designation of Tevelev as "Owner" instead of "President." The Court therefore does not credit Mahendran's claim that she was promised a biweekly salary of $3,000.00 starting from when she was rehired in July 2013. Instead, the Court finds that her biweekly salary as of that date was $1,500.00 based on the defendants' payroll records that begin in April 2014.

"The FLSA provides for 'the payment of wages lost and an additional equal amount as liquidated damages,' unless 'the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that his belief was reasonable.'" *Gortat v. Capala Bros.*, 949 F. Supp. 2d 374, 380 (E.D.N.Y. 2013) (alterations omitted) (quoting 29 U.S.C. §§ 216(b), 260). The Court makes separate good faith and reasonableness findings below.

### 1. <u>Christian's Underpayment Claims</u>

The Court awards Christian a total of $70,075.00 for her underpayment claims.

#### i. *Prior to October 21, 2012*

##### a. <u>Underpayment</u>

The Court finds that Christian was underpaid by $3,650.00 for the period

between the start of her employment and October 21, 2012.

### b.    Liquidated Damages

The Court finds that this underpayment was not in good faith and was not reasonable. Although the evidence suggests that the lab was experiencing financial difficulties even before Hurricane Sandy, the defendants have produced no evidence that they believed their actions were in compliance with the law. Accordingly, the Court finds that Christian is entitled to an additional $3,650.00 in liquidated damages for this period.

### ii.    *Between October 22, 2012 and January 26, 2014*

### a.    Underpayment

The Court finds that Christian was underpaid by $59,450.00 for the period between October 22, 2012 and January 26, 2014.

Christian claims that she was asked to stay on as a full-time employee at her $1,950.00 biweekly salary to help restore MSL. In support, she offers her own testimony as well as the testimony of multiple disinterested witnesses, including that of the defendants' own witness, Dr. Sheikh, who said he regularly saw her at the lab. She also offered some handwritten notes memorializing her time in the lab. *See* Pl. Ex. 5. The defendants claim that Christian was laid off as a full-time employee and rehired as an independent contractor who only occasionally was asked to help on a per diem basis.

The defendants' only response to Christian's evidence is that with the lab in disrepair, there would not have been sufficient work for her to do to justify the hours of work she claims she did. Even if this were true, the defendants have produced no evidence that Christian was laid off as a fulltime employee or taken off of payroll. Even if the amount of work Christian had to do did not justify her salary, the proper course of action would have been to formally lay Christian off or reduce her salary. There is no evidence that that ever happened.

Thus, the Court finds that Christian was entitled to her $1,950.00 biweekly salary. Based on this rate of pay, Christian was entitled to $64,350.00 between October 22, 2016 and January 26, 2014. Her spreadsheet and a tax form that was introduced into evidence, Pl. Ex. 13, show that she was paid $4,900.00 during this period. Thus, the Court finds that she was underpaid by $59,450.00.

### b. Liquidated Damages

Other than the first week before October 29, 2012 (when Hurricane Sandy made landfall in Staten Island), the Court finds that this underpayment was in good faith and reasonable.

Christian failed to carry her burden that she was in fact working in a fulltime or even nearly fulltime capacity during this time period. The testimony adduced at trial strongly suggests that there was not enough work to be performed during much of that time, and that the defendants intended to lay off all of their workers and

engage a few as independent contractors working on a per diem basis. That they did not do this is a testament to a less-than-professional operation, but not subjective bad faith.[12] And in light of the tremendous damage that Hurricane Sandy inflicted on the business and on the community, the Court finds that the failure to observe formalities with respect to employee classification was reasonable.

Accordingly, for this period, the Court finds that Christian is entitled to liquidated damages only for the week of October 22, 2019 to October 29, 2019. That week corresponds to half a pay period in which Christian was earning $1,950.00. The Court thus finds that Christian is entitled to $975.00 in liquidated damages for this period.

### iii. Between January 27, 2014 and January 25, 2017

#### a. Underpayment

The Court finds that Christian was underpaid by $1,175.00 for the period between January 27, 2014 and January 25, 2017.

The defendants' official payroll records do not resume until April 10, 2014. However, Christian's contemporaneously maintained records indicated that she began receiving biweekly $1,350.00 payments beginning on January 27, 2014.

---

[12] For example, Abramovsky testified that even the laid off employees such as Mahendran were not formally laid off. *See* Tr. 6/4/2019 at 9:21–24 ("It's not that we exactly laid them off, it was a suggestion because the lab wasn't working, the money wasn't coming in, and we could not support the lab. It was very difficult.").

While this is lower than her previous biweekly salary of $1,950.00, her spreadsheet does not note a balance owed for these payments and she did not testify otherwise. The Court thus finds that Christian accepted a reduction in pay to a biweekly salary of $1,350.00.

With five exceptions, she continued receiving the full $1,350.00 until December 2014, when she got a raise.[13] Apart from the five exceptions, Christian does not claim she is owed any additional money for this time period. The Court thus finds that she was underpaid by $1,175.00.

### b. Liquidated Damages

The Court finds that this underpayment was not in good faith and was not reasonable. Although the evidence suggests that the lab was experiencing financial difficulties even though its license was restored, the defendants have produced no evidence that they believed their actions were in compliance with the law. At this point, the defendants were intentionally underpaying a salaried employee, rather than inadvertently retaining an occasional contractor on payroll. Accordingly, the Court finds that Christian is entitled to an additional $1,175.00 in liquidated damages for this period.

---

[13] The five exceptions are for the following pay periods: 03.24.14–04.06.14, 04.07.14–04.20.14, 08.25.14–09.07.14, 09.08.14–09.21.14, and 09.22.14–10.05.14. Both the official payroll records and Christian's contemporaneous records recite that she was paid $1,200, $1,200, $1,175, $1,100, and $1,100, respectively, for those pay periods. With a $1,350.00 salary, the deficit adds up to $1,175.00.

## 2.    **Mahendran's Underpayment Claims**

The Court awards Mahendran a total of $25,800.00 for her underpayment claims.

### i.    *Prior to October 21, 2012*

The Court finds that Mahendran is not owed any money for the period between the start of her employment and October 21, 2012.

Although there is no dispute that Mahendran worked during this period, she has not produced any evidence of how much she was underpaid (other than Plaintiffs' Exhibit 20, which the Court does not credit as explained above). In the absence of "evidence from which violations of the Act *and the amount of an award may be reasonably inferred*," *Reich*, 121 F.3d at 66 (emphasis added), the Court finds that Mahendran did not carry her burden of proof on her underpayment claims during this period.

### ii.    *Between July 18, 2013 and October 22, 2015*

#### a.    Underpayment

The Court finds that Mahendran was underpaid by $25,800.00 for the period between July 18, 2013 and October 22, 2015.

Mahendran was rehired on July 18, 2013.[14] Unlike Christian, Mahendran has

---

[14] There is no evidence in the record of the exact date of her rehiring. However, Dr. Sheikh informed the DOH in a letter dated July 18, 2013 that Mahendran was "appointed immediately" as the new general supervisor of the lab.

no documentation of her earnings and only relies on Plaintiffs' Exhibit 24, the letter purportedly from "Vadim Tevelev, Owner," which says that she was making $3,000.00 biweekly.

As explained above, the Court finds this letter non-credible. Moreover, Mahendran consistently made less than $3,000.00 biweekly from her rehiring until her departure in October 2015. Although it is of course conceivable that Mahendran believed she was being underpaid throughout this entire time, the Court would expect some more corroborating evidence given that she took no other action. Accordingly, as explained above, the Court finds that Mahendran's biweekly salary was $1,500.00 when she was rehired in July.

The defendants claim that Mahendran was not actually working when she was hired because her only role was to be a lab supervisor on paper. Much as with Christian, however, the defendants do not provide any evidence that Mahendran was actually hired on a per diem basis. In the absence of evidence of such an arrangement, the Court finds that MSL promised to pay Mahendran $1,500.00 biweekly, which is the amount the payroll records show she was being paid in April 2014.

Because there are no reductions in pay in the payroll records once they start,

---

For lack of any other evidence, the Court adopts July 18, 2013 as Mahendran's official start date.

the Court finds that Mahendran was only underpaid between July 18, 2013, when she was rehired, and April 10, 2014, when the payroll records show that she was being regularly paid. Based on Christian's spreadsheet, which shows MSL's payroll schedule, that time span covers 19 pay periods. The Court thus finds that Mahendran was entitled to $28,500.00 during that period. Her testimony and a tax form, Pl. Ex. 22, show that she was paid $2,700.00 during this time. Thus, the Court finds that she was underpaid by $25,800.00.

### b.    Liquidated Damages

For the same reasons as Christian, *see supra* Section II.A.1.ii.b, the Court finds that the defendants' underpayment during this time period was in good faith and reasonable. Accordingly, Mahendran is not entitled to any liquidated damages for this period.

## 3.    **Prejudgment Interest**

The plaintiffs bring their underpayment claims under both the FLSA and the NYLL. Under the NYLL, a plaintiff may recover both liquidated damages (in an amount equal to underpayment) and prejudgment interest. *Fermin v. Las Delicias Perunas Rest., Inc.*, 93 F. Supp. 3d 19, 48 (E.D.N.Y. 2015). Moreover, the standards for awarding liquidated damages under the NYLL and the FLSA are essentially the same. *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 340–41 (S.D.N.Y. 2005). Accordingly, the plaintiffs are entitled to prejudgment interest on their

underpayment claims.

"Where . . . damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." NY C.P.L.R. § 5001(b). Prejudgment interest accrues at the statutory annual rate of 9%. *Id.* § 5004.

The Court adopts each plaintiffs' last date of employment as her respective "single reasonable intermediate date." Thus, Christian is entitled to prejudgment interest on $70,075.00 accruing at an annual rate of 9% from January 25, 2017. Mahendran is entitled to prejudgment interest on $25,800.00 accruing at an annual rate of 9% from October 22, 2015.

## B.     <u>Notice Claims</u>

Both plaintiffs testified that they were not given any notice of their wages when they were hired as required by NYLL § 195. NYLL § 198(1-b) provides for "damages of fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars." No contrary documentary evidence was produced. The Court finds the testimony credible and finds that neither plaintiff was given the required notices. Since both plaintiffs worked for more than 100 days, the Court awards $5,000.00 in notice damages to each plaintiff.

## C.     Christian's Retaliation Claim

The Court awards Christian a total of $50,250.00 for her retaliation claim.

### 1.     Retaliation

Christian testified that in January 2017, she asked to be paid back her earned wages from 2012, 2013, and 2014.  In response, she testified that Abramovsky's exact words were "I will not pay you a single penny . . . and you can take this paper and garbage it. . . . . [Y]ou have to completely forget about it and continue with what you get paid."  Tr. 5/6/2019 at 56:16–20.  Christian testified that she was terminated soon after this conversation in retaliation for requesting her money and refusing to accept that she would not be paid back.  *See id.* at 57:4–5.

Unsurprisingly, the defendants' story is different.  Abramovsky testified that in 2017, MSL engaged an unnamed "management company" to outsource their non-technical employees such as Christian.  Under the arrangement, Christian would be hired at the same rate of pay by the management company and work as a contractor for MSL.  A contract to that effect was drawn up and most employees signed it.  But Christian declined to sign despite being advised that her pay would remain the same.  *See* Tr. 6/4/2019 at 20:19–21:18.

The elements of retaliation under the NYLL are that an employee "made a complaint about the employer's violation of the New York Labor Law and was terminated or otherwise penalized, discriminated against, or subjected to an adverse

employment action as a result." *Higueros v. New York State Catholic Health Plan, Inc.*, 526 F. Supp. 2d 342, 347 (E.D.N.Y. 2007). There must be "a nexus between the employee's complaint and the employer's retaliatory action." *Id.* A close connection in time can provide evidence for a causal connection. *See Jacques v. DiMarzio, Inc.*, 200 F. Supp. 2d 151, 162 (E.D.N.Y. 2002).

The defendants provide no evidence of their version of events. Abramovsky's testimony is uncorroborated, even though he claims that Guru was present when he spoke with Christian. *See* Tr. 6/4/2019 at 21:16–18. Furthermore, no contract with the unnamed management company was ever produced.

In light of the temporal proximity and dearth of competing evidence, the Court finds that Christian was retaliatorily terminated. She next obtained employment on July 1, 2017. Tr. 5/6/2019 at 13:13–14. Between January 25, 2017 and July 1, 2017, she would have earned $30,250.00. *See* Pl. Ex. 17 (showing a biweekly salary of $2,750.00 as of the end of 2016).

## 2. **Liquidated Damages**

Christian requests an equal amount in liquidated damages for her retaliation claim. However, under the WTPA (which amended the NYLL), liquidated damages for retaliation are capped at $20,000.00. *See* NYLL § 215(b). The Court awards $20,000.00 in liquidated damages.

**D.** **Attorneys' Fees and Costs**

    **1.** **Fees**

Both the FLSA and NYLL include fee-shifting provisions for successful plaintiffs. *See* 29 U.S.C. § 216(b); NYLL § 198(1-a). The lodestar method (the product of a reasonable hourly rate and a reasonable number of expended hours) "creates a 'presumptively reasonable fee.'" *Millea v. Metro-North R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. Of Albany*, 522 F.3d 182, 183 (2d Cir. 2008)). A reasonable hourly rate is one that a client would reasonably pay to an attorney in the district given the nature of the case at issue. *See Arbor Hill*, 522 F.3d at 190–91.

The plaintiffs request a total of $81,500.00 in attorneys' fees. This figure is based on the work of two attorneys, Alex Umansky, Esq., who worked for 177.5 hours and for whom plaintiffs request a $400.00 hourly rate; and Gennady Litvin, Esq., who worked for 30 hours and for whom plaintiffs request a $350.00 hourly rate. *See* Dkt. No. 39-3.

Umansky filed a declaration describing his work experience. *See* Dkt. No. 39-1. A partner at the Law Office of Yuriy Moshes, P.C., he has been practicing law for over eight years, with much of his practice focused on civil rights work, employment discrimination, and wage and hour claims. He has tried numerous cases to verdict and has obtained judgments in the hundreds of thousands of dollars for his

clients.  Litvin is an associate at the same firm and has been practicing since 2008.

In addition to their experience, the attorneys point out that employment cases tend

to be particularly risky and are almost always undertaken on a contingency basis.

*See* Dkt. No. 39-1 ¶¶ 22–25.

A published decision in the Eastern District of New York has observed that

attorneys of significant experience and reputation in the district have been awarded

hourly rates ranging from $300.00 to $450.00.  *See Sass v. MTA Bus Co.*, 6 F. Supp.

3d 238, 261 (E.D.N.Y. 2014) (collecting cases); *see also Luca v. Cty. Of Nassau*,

698 F. Supp. 2d 296, 301–02 (E.D.N.Y. 2010) (awarding $400.00 to a partner with

25 years' worth of experience).  But as this Court has already once noted, "several

years have passed since *Sass* was decided, and attorney's fees, like other goods and

services, increase in cost with inflation."  *Almond v. PJ Far Rockaway, Inc.*, No. 15-

cv-06792, 2018 WL 922184, at *2 (E.D.N.Y. Feb. 15, 2018).  Accordingly, although

Umansky's proposed hourly rate of $400.00 is on the high end of some previously

cited ranges, the Court finds that it is reasonable in 2019.  The Court likewise finds

that Litvin's proposed hourly rate of $350.00 is reasonable.  Finally, the Court finds

that the number of hours expended by both attorneys was reasonable.  The Court

thus awards $81,500.00 to the plaintiffs in attorneys' fees.

## 2. Costs

The plaintiffs also request $2,035.98 in costs.  In addition to the standard fees

such as filing fees and transcript orders, the plaintiffs incurred $230.00 in costs for serving Svetlana with a subpoena. This service was incurred only because the Court strongly suggested that the plaintiffs may wish to call Svetlana as a witness. Although the plaintiffs served Svetlana, they declined the Court's assistance to enforce the subpoena when she did not appear. Accordingly, the Court denies the costs associated with serving Svetlana and awards the plaintiffs a joint total of $1805.98 in costs.

## III. <u>CONCLUSION</u>

### A. <u>Christian</u>

The Court awards Christian a total of $125,325.00.[15] In addition, Christian is entitled to 9% interest on $70,075.00 accruing annually from January 22, 2017 until the entry of judgment.

### B. <u>Mahendran</u>

The Court awards Mahendran a total of $30,800.00.[16] In addition, Mahendran is entitled to 9% interest on $25,800.00 accruing annually from October 22, 2015

---

[15] This sum consists of (A) $70,075.00 in unpaid wages and liquidated damages associated with unpaid wages, (B) $50,250.00 in backpay for retaliation and liquidated damages associated with retaliation, and (C) $5,000.00 in notice damages.

[16] This sum consists of (A) $25,800.00 in unpaid wages and liquidated damages associated with unpaid wages, and (B) $5,000.00 in notice damages.

until the entry of judgment.

**C.** **Joint**

The Court jointly awards Christian and Mahendran $81,500.00 in attorneys'
fees and $1,805.98 in costs.

**SO ORDERED.**


                  _____

                  /S/ Frederic Block

                  FREDERIC BLOCK

                  Senior United States District Judge

Brooklyn, New York
August 8, 2019